IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DIAELDIN OSMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:21-cv-525-RAH |
| | ) | [WO] |
| ALABAMA STATE UNIVERSITY, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

## I.  INTRODUCTION

Plaintiff Diaeldin Osman—who is Muslim, Black, of African ancestry, and of Sudanese descent—brings this action against his former employer, Alabama State University (ASU), and Kamal Hingorani (collectively, the Defendants).  In his Second Amended Complaint (the operative complaint), Dr. Osman brings disparate treatment and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Title VII), and 42 U.S.C. §§ 1981 and 1983.  Among others, Dr. Osman claims that ASU failed to promote him based on his religion; national origin; and race, including ancestry; and in retaliation for his complaints about disparate treatment he allegedly suffered.

Now pending before the Court is the Defendants' Motion for Summary Judgment.  (Doc. 60.)  The motion is fully briefed and ripe for review.  Upon

1

consideration of the briefs, evidence, and applicable law, and for the reasons that follow, the Defendants' motion for summary judgment is due to be granted.

## II. JURISDICTION AND VENUE

The Court has original subject matter jurisdiction over Dr. Osman's claims under 28 U.S.C. § 1331.  Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama.  *See* 28 U.S.C. § 1391.

## III. LEGAL STANDARD

To succeed on a motion for summary judgment, the moving party must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The court views the evidence, and all reasonable inferences drawn from it, in the light most favorable to the nonmoving party.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact.  *Id.*  Or a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce

admissible evidence to support" a material fact.  Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee's note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. . . . [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.").  If the movant meets its burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists.  *Celotex Corp.*, 477 U.S. at 324.  A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## IV.  BACKGROUND

The facts, stated in the light most favorable to Dr. Osman, are as follows:

On January 1, 2019, Dr. Osman began his employment at ASU as an Assistant Professor of Accounting in ASU's College of Business Administration (COBA).  Dr. Osman was employed in that role until he resigned in April 2022. At all relevant times, Dr. Kamal Hingorani was the Dean of COBA, Dr. Dave Thompson was the Chair of COBA's Department of Accounting and Finance, and

Dr. Carl Pettis was ASU's Provost and Vice President for Academic Affairs.[1] Dr. Hingorani is Hindu, of Indian descent, and of Asian ancestry.[2] Dr. Hingorani knew that Dr. Osman was Muslim and from Sudan.

Dr. Osman's lawsuit centers on ASU's failure to promote him to the position of Associate Professor of Accounting, along with other incidents of alleged disparate treatment and retaliation. The Court will first set out the relevant ASU policies and Faculty Handbook provisions and then will set out the relevant facts pertaining to Dr. Osman's employment at ASU.

### A.  Relevant ASU Policies and Faculty Handbook Provisions

#### 1.  Faculty Appointments

ASU's Faculty Handbook outlines three types of faculty appointments: temporary, probationary, and tenured. (Doc. 62-4 at 40–41.) Dr. Osman was hired as a probationary appointment, which the Faculty Handbook defines as "appointment for one year (nine or ten months) at a time until a faculty member is granted tenure or non-reappointment." (*Id.* at 40.) Probationary appointments "are

---

[1] Dr. Pettis was the Associate Interim Provost and Vice President for Academic Affairs from Fall 2017 though Fall 2018, the Interim Provost and Vice President for Academic Affairs from Fall 2018 through Fall 2020, and Provost and Vice President for Academic Affairs from Fall 2020 through the present. (Doc. 62-23 at 1.) Thus, for some period of Dr. Osman's employment at ASU, Dr. Pettis was the Interim Provost. The parties do not contend that this difference in Dr. Pettis's title is relevant to the issues in this case or that any other individual served as Provost during Dr. Osman's employment at ASU.

[2] According to Dr. Osman, Dr. Thompson is Black. The record is silent as to the religion, national origin, or race of Dr. Pettis.

made to positions that the university anticipates will be held by tenured faculty members." (*Id.* at 47.)  According to Dr. Pettis, a probationary appointment is synonymous with tenure track.  (Doc. 62-3 at 17.)  The Faculty Handbook provides that the "probationary period prior to acquisition of tenure will not exceed seven years of probationary service with the rank of instructor or higher in accredited colleges or universities, provided that at least four (4) years have been at Alabama State University."  (Doc. 62-4 at 47.)

### 2.  Special Criteria by Rank

The Faculty Handbook also sets out special criteria by rank: instructor, assistant professor, associate professor, and full professor.  These criteria apply to new appointments and promotions.   As relevant here, the Faculty Handbook requires associate professors to have "[f]ive academic years of successful teaching experience at an accredited college/university," with "[t]hree (3) of the years of experience . . . at the rank of assistant professor, completed by the time the appointment/promotion becomes effective." (*Id.* at 43.)

### 3.  Credit for Prior Teaching Experience

Section 3.3.1.H. of the Faculty Handbook provides that successful candidates for faculty appointments are sent a proposed contract informing the candidate of "the terms and conditions of the appointment (including allowable prior probationary credit)."  (*Id.* at 46.)   According to Dr. Pettis, all faculty

members who are hired at ASU start either at zero or a number of years towards their probationary service for tenure or promotion, based on past experience. Unless they start at a number of years, faculty members start at ASU "as if they've never taught anywhere." (Doc. 62-3 at 17.)

Dr. Pettis testified that he decides whether to grant a faculty member credit for prior teaching experience upon their hire after receiving a recommendation from the relevant department, and that his decision is subject to the ASU president's final approval. (*Id.* at 20–21.) Dr. Thompson also testified that the provost ultimately decides whether to grant teaching credits. (Doc. 65-1 at 24.)

According to Dr. Hingorani, new faculty hires "generally" start at zero years "with this provost." (Doc. 62-2 at 27.) Dr. Hingorani claims that the Provost believes faculty members' research contributions at ASU start only after two years, and if a faculty member were hired with creditable years, they would have fewer years to perform research at ASU before applying for tenure. (*Id.* at 25.)[3]

### 4. Procedures for Promotion in Rank

Section 3.5 of Faculty Handbook sets out procedures for promotions in rank. These procedures are different from the policies and procedures for tenure. Section 3.5 requires faculty members being considered for promotion to "submit a

---

[3] In his deposition, Dr. Pettis neither confirmed nor denied holding these beliefs, but it appears he was not asked directly about them. Dr. Pettis did testify that when deciding whether to adopt a department's recommendation, he considers "the file as submitted." (Doc. 62-3 at 21.)

dossier to the department chair that includes (1) a personal resume, (2) a copy of all relevant Annual Performance Reviews and their supporting documentation, (3) letters of recommendation, and (4) a completed Faculty Evaluation Promotion Review: Selected Performance Area Percentage Weights Form." (Doc. 62-4 at 52.) Additional letters of recommendation may be added to the dossier.

The department chair is then responsible for establishing a promotion review committee consisting of the department chair and four other faculty members. "Whenever possible, three of the four other faculty members should be members of the appropriate department, one should be from another department, and all four should hold professorial rank at least equal to that proposed for the faculty member being considered for promotion." (*Id.* at 53.) The committee reviews the applicant's dossier, completes the official Promotion Assessment Forms, and sends its recommendation and the applicant's dossier to the appropriate dean. Next, the dean prepares and sends their own written recommendation for the applicant to the provost. The provost "evaluate[s] all recommendations submitted including dossiers and any other information requested" and sends "written recommendations for promotions to the president by April 15." (*Id.*) The president then submits all final recommendations to the ASU Board of Trustees (the Board) to be considered at the Board's regular May meeting.

After the Board's May meeting, the provost notifies, in writing, the faculty members whose promotions were approved by the Board.   The provost also notifies faculty members whose names were submitted to the Board to be considered for promotion but who were not promoted.   The Faculty Handbook does not require that unsuccessful applicants be notified of the reason(s) why they were not promoted.

### B.  Dr. Osman's Employment at ASU

#### 1.  Hiring and Nonreceipt of Teaching Credit

Before joining the ASU faculty, Dr. Osman was an Assistant Professor of Accounting for approximately three and a half years at Alcorn State University. Dr. Osman asserts that when he was hired at ASU, Dr. Hingorani informed him that he would be eligible for tenure in two years because he would receive credit for his prior teaching experience.  (Doc. 62-15 at 22.)  However, Dr. Osman was credited with zero years towards his probationary service for promotion or tenure, which is reflected on his signed Notice of Employment with a notation "0 Years," (Doc. 62-1), and his salary computation sheet, (Doc. 62-24).  Thus, regardless of Dr. Osman's actual prior teaching experience, ASU considered Dr. Osman to have no prior teaching experience when he was hired.

Dr. Hingorani did not recall the alleged conversation with Dr. Osman regarding teaching credit and tenure, but it is undisputed Dr. Hingorani did not

recommend that Dr. Osman receive this credit.   Dr. Hingorani admitted he "maybe" could have recommended that Dr. Osman receive "some" credit for his time teaching at Alcorn State.  (Doc. 62-2 at 24.)  Dr. Hingorani also claims the department chair created Dr. Osman's Salary Computation Sheet, which reflected zero years, and Dr. Hingorani merely signed off on it.  (*Id.* at 25.)  Thus, according to Dr. Hingorani, the department chair decided not to give Dr. Hingorani the credit.

## 2. Treatment of Other Faculty Members Regarding Prior Teaching  Experience

The record contains evidence regarding ASU's treatment of two other COBA faculty members regarding prior teaching experience.   In 2015, Dr. Hingorani recommended that Dr. Ngo-Ye be hired as an Assistant Professor of Computer Information Systems in COBA's Department of Computer Information Systems with two years' teaching credit towards tenure and that he be eligible for tenure after two years at ASU.  (*Id.* at 28–29.)  Because Dr. Pettis was not yet the Provost, he was not involved in the decision to grant Dr. Ngo-Ye teaching credit. According to Dr. Hingorani, his recommendation for Dr. Ngo-Ye occurred before Dr. Pettis became the Provost and allegedly changed the rules on teaching credits such that new faculty hires now generally start at zero years due to concerns about time for research contributions at ASU.  (*Id.* at 27–28.)  The record does not reveal Dr. Ngo-Ye's race, religion, or national origin.

Additionally, Dr. Kim, a Korean Asian accounting professor at ASU, had prior teaching experience at other institutions, including one year at ASU. Nonetheless, Dr. Kim was hired at ASU with zero years of creditable teaching experience. (*Id.* at 20–21.) The parties do not assert or provide evidence regarding when Dr. Kim was hired at ASU or who was involved in the decision to not grant him teaching credit. When Dr. Kim applied for a promotion to the position of Associate Professor, Dr. Hingorani overrode the committee's rejection of his application and recommended his promotion to Dr. Pettis. (Doc. 65-13 at 2–3.) But Dr. Pettis disagreed and did not recommend Dr. Kim, and so Dr. Kim was not granted tenure. (*See* Doc. 62-15 at 14.)

### 3.  Dr. Osman Applies for a Promotion

In early 2021, Dr. Osman applied for a promotion to the position of Associate Professor of Accounting. According to Dr. Osman, his promotion review process was riddled with deviations from the Faculty Handbook, which he attributes to Dr. Hingorani. First, although the department chair is responsible for assembling the promotion review committee, Dr. Hingorani assembled Dr. Osman's committee. In addition, Dr. Osman's committee comprised ten individuals rather than five. Dr. Hingorani was not a committee member. Dr. Osman also complains that Dr. Hingorani and at least three committee members reviewed Dr. Osman's publications outside of his dossier and discussed

those publications with other committee members.  According to Dr. Thompson, the committee's review of a promotion applicant's research "should" be limited to the dossier, and reviewing research outside of the dossier is not common.  (Doc. 65-1 at 13.)  However, Dr. Thompson also testified that committee members would not be doing anything wrong if they reviewed information outside of the dossier.  (*Id.* at 27.)

Dr. Hingorani also allegedly had inappropriate discussions with committee members after the promotion review meeting, even though those meetings carry an expectation of confidentiality.  During these discussions, at least one committee member told Dr. Hingorani that one of Dr. Osman's papers contained self-plagiarism, in that portions of the paper were taken verbatim from one of Dr. Osman's older articles without citing the older article.  Dr. Hingorani thereafter directed another committee member to confirm whether the paper was self-plagiarized.

The promotion review committee's recommendation was evenly split, with five members voting in favor of promotion and five members voting against.  No reasons were given in the committee's memorandum to Dr. Hingorani.  (Doc. 65-14 at 6.)

Thereafter, Dr. Hingorani recommended to Dr. Pettis that Dr. Osman not be promoted.  In his recommendation letter, Dr. Hingorani explained that the

committee members who voted against promotion determined that Dr. Osman had self-plagiarized a recent paper. Dr. Hingorani wrote that self-plagiarism is "unethical and is viewed seriously at major universities" and that ASU "cannot condone such a major breach of trust." (Doc. 62-7 at 1.) Dr. Osman does not deny that he self-plagiarized the paper but notes that the publication asserted that his actions were not self-plagiarism. (Doc. 62-15 at 37.) Additionally, Dr. Hingorani acknowledged in his recommendation letter to Dr. Pettis that ASU "do[es] not have any policy for plagiarism of this sort in the faculty handbook." (Doc. 62-7 at 3.) Dr. Osman also contends it was inappropriate for Dr. Hingorani to have this information because, according to Dr. Osman, promotion review committee discussions are presumed confidential. He also complains that he was never given the opportunity to defend himself.

Dr. Hingorani provided additional reasons why he believed Dr. Osman should not be promoted. According to Dr. Hingorani, Dr. Osman's résumé contained grammatical and typographical errors as well as improper citation style; listed irrelevant skills; and ranked his CPA from Australia above his terminal degree, "which is unbecoming of a faculty in a high-quality university." (*Id.*) Dr. Hingorani also faulted Dr. Osman for claiming in an online database that he is the first author on a paper for which he is actually the second author. Additionally, Dr. Hingorani criticized the quality of the articles Dr. Osman published while at

ASU.  Aside from the recommendation letter, Dr. Hingorani did not discuss his recommendation with Dr. Pettis.

Dr. Pettis testified that he independently reviews the dossiers submitted by promotion and tenure applicants, and that neither the committee scores nor the department chairs' or deans' recommendations determine whether an applicant obtains a promotion or tenure.  Because Dr. Osman's dossier contained only two years of material, Dr. Pettis checked Dr. Osman's Notice of Employment in his Human Resources file to see whether he had been given teaching credit when he was hired.  (Doc. 62-3 at 20.)  Upon learning that Dr. Osman did not have such credit, Dr. Pettis determined he was not eligible for promotion.

Dr. Pettis did not recommend that Dr. Osman be promoted, and Dr. Pettis claims he made this decision no later than April 15, 2021.  In his deposition and in his affidavit, Dr. Pettis testified he did not recommend Dr. Osman for promotion because Dr. Osman was ineligible due to his lack of requisite teaching experience. (*Id.* at 16–17; Doc. 62-23 at 2.)  When Dr. Osman applied for a promotion to Associate Professor, ASU considered him to have two years of teaching experience as an assistant professor.  But to be eligible for this promotion under the Faculty Handbook, Dr. Osman was required to have "[f]ive academic years of successful teaching experience at an accredited college/university," with three years at the assistant professor rank.  (*See* Doc. 62-4 at 43.)  Thus, according to Dr. Pettis,

13

Dr. Osman was not eligible because he lacked the teaching experience proscribed by the Faculty Handbook.[4]  According to Dr. Hingorani, however, Dr. Osman was

_____

[4] Focusing on a single statement in Dr. Pettis's deposition, Dr. Osman contends that Dr. Pettis's asserted reason for not recommending the promotion was that Dr. Osman lacked the requisite years at ASU.  The Court disagrees.  When asked by Dr. Osman's counsel if he recalled reviewing Dr. Osman's dossier, Dr. Pettis responded: "The more immediate piece to Dr. Osman's situation was his years of employment at Alabama State University.  He was not eligible for a promotion."  (Doc. 62-3 at 10.)  Dr. Pettis further explained that "as stipulated by the faculty handbook and in accordance with what [Dr. Osman's] notice of employment – how it reads, he was not eligible for promotion."  (*Id.*)  Dr. Osman's counsel then began asking about Dr. Pettis's recommendation to the President.

Shortly thereafter, Dr. Osman's counsel asked what provision in the Faculty Handbook required Dr. Osman to have four years of teaching at ASU before he was qualified for a promotion.  Dr. Pettis responded that he had not testified to that regarding promotion.  Then, when asked where in the Handbook "is the requisite number of years for promotion," Dr. Pettis referred to page 43, specifically the language under the heading "Associate Professor," and read out the paragraph that begins "[f]ive academic years of successful teaching experience at an accredited college or university."  (*Id.* at 16.)  When asked whether Dr. Osman had five academic years of successful teaching experience, Dr. Pettis responded: "Dr. Osman's notice of employment I believe started off with zero years," clarifying that this meant "[z]ero years towards the promotion as well as tenure clock as well."  (*Id.*)  Dr. Pettis further testified that Dr. Osman was "probationary zero years" upon his hire, "so there was no credit given towards promotion and/or tenure."  (*Id.*)  Additionally, Dr. Pettis testified that he did not advance Dr. Osman's name to the president because Dr. Osman lacked the requisite number of years to be eligible, further stating "I didn't say at ASU.  I said he didn't have the requisite years."  (*Id.* at 16–17.)  And when asked about another faculty member who was hired at ASU as an associate professor and whether such faculty member had a number of years at ASU, Dr. Pettis again stated, "I haven't said anything about years at ASU."  (*Id.* at 16.)  Finally, Dr. Pettis stated in his affidavit he did not recommend Dr. Osman for promotion because Dr. Osman was ineligible due to his lack of requisite teaching experience.  (Doc. 62-23 at 2.)

Viewing the entirety of his deposition and affidavit, Dr. Pettis did not testify that Dr. Osman was ineligible because Dr. Osman lacked requisite years *at ASU*.  The single statement where Dr. Pettis referenced years of employment at ASU is a mere "scintilla of evidence," which is insufficient to create a genuine dispute of material fact as to Dr. Pettis's proffered reason for not recommending Dr. Osman for promotion: Dr. Osman lacked the requisite years of teaching experience.  *See Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986); *see also Word v. AT&T*, 576 F. App'x 908, 917 (11th Cir. 2014) (per curiam) (explaining that, when viewed in context, a material disciplinary letter was misdated, and thus the letter was at most a mere scintilla of evidence supporting an FMLA retaliation claim and did not create a genuine dispute of material fact as to whether the defendant retaliated against the plaintiff), *overruled in part on other grounds by Lewis v. City of Union City*, 913 F.3d 1213 (11th Cir. 2019) (en banc).

ready to apply for the Associate Professor promotion based on his teaching experience.  (Doc. 62-2 at 33.)

Dr. Pettis also testified that he was concerned about the allegations of self-plagiarism.  He admitted he did not independently review Dr. Osman's allegedly self-plagiarized publication but instead relied on the dean and promotion review committee who, according to Dr. Pettis, are the subject matter experts.  Dr. Pettis insisted, however, that the "number one issue [was] the fact that [Dr. Osman] was not eligible for a promotion."  (Doc. 62-3 at 10.)  Dr. Pettis further testified that even if Dr. Hingorani and the promotion review committee had recommended Dr. Osman be promoted, Dr. Pettis still would not have recommended the promotion because Dr. Osman was not eligible due to the lack of requisite years.

Because Dr. Pettis did not recommend Dr. Osman for promotion, Dr. Pettis did not forward Dr. Osman's name to the President, and thus the President did not forward Dr. Osman's name to the Board for consideration.  It is undisputed that the Board did not vote on Dr. Osman's promotion application at the May 6, 2021 meeting.  According to Dr. Pettis, his letters to the President include only the names of applicants whom Dr. Pettis is recommending for promotion.  Dr. Pettis explained that he verbally informs the President about which candidates were not recommended for promotion and why, and Dr. Pettis claims he told the President that he did not recommend Dr. Osman because Dr. Osman was not eligible.

On or about May 7, 2021, Dr. Pettis sent Dr. Osman a letter informing him that his application for promotion had been denied.  (Doc. 62-12.)  Dr. Osman claims he did not learn his application had been denied until the end of May or sometime in June.[5]  Dr. Pettis's letter did not explain why Dr. Osman's promotion application had been denied, and it is undisputed that Dr. Pettis did not otherwise inform Dr. Osman why the application had been denied.  Dr. Pettis testified that an unsuccessful promotion applicant would need to discuss their application and ways to improve it with their department chair and dean, although Dr. Pettis also asserted it is not required that the reason for a promotion denial be communicated to the applicant.

### 4.  Other Evidence of Discrimination

Aside from the promotion denial, Dr. Osman alleges he was subjected to other discriminatory treatment based on his national origin, religion, and race (including ancestry).  According to Dr. Osman, Dr. Hingorani said he did not like Dr. Thompson or Dr. Osman because they are Black and he (Dr. Hingorani) would do whatever he could to prevent Dr. Osman from being promoted.[6]  Dr. Hingorani also allegedly made disparaging comments about ASU's African-American and

---

[5] In his second EEOC charge, Dr. Osman attested that he learned he did not get the promotion on May 25, 2021.  (Doc. 62-20.)  In his deposition, however, he testified he did not receive Dr. Pettis's letter until sometime in June after he returned from a trip to Africa.  (Doc. 62-15 at 35.)

[6] According to Dr. Osman, Dr. Hingorani made these statements to Dr. Thompson, who in turn relayed them to Dr. Osman.  (Doc. 62-15 at 20.)

Black students.   In one instance, Dr. Hingorani allegedly made a disparaging remark about the quality of ASU's African-American students and told Dr. Osman he "come[s] from a country where [he] should understand."   (Doc. 65-2 at 5.) Additionally, in an email exchange regarding Dr. Osman's interest in applying for tenure, Dr. Hingorani reminded Dr. Osman of the Faculty Handbook's criteria for tenure and further stated that the Faculty Handbook "is the Bible" and "[w]e all have to follow it." (Doc. 65-3 at 3.)  Dr. Osman responded that he is a Muslim and took issue with Dr. Hingorani's choice of words, to which Dr. Hingorani responded with an apology and stated that he meant the Faculty Handbook is "sacrosanct." (*Id.*)

Dr. Osman also contends that Dr. Hingorani failed to congratulate him or acknowledge his accomplishments to the rest of the COBA faculty, while congratulating and acknowledging the accomplishments of non-Black, non-African, and non-Muslim faculty.  Additionally, Dr. Hingorani allegedly refused to select Dr. Osman to serve on committees or respond to Dr. Osman's requests to serve on committees.

Dr. Osman also complains that he was publicly reprimanded by Dr. Hingorani regarding his conduct as a faculty advisor in advising a student about her enrolled classes and graduation requirements. Dr. Osman says Dr. Hingorani threatened him with "serious consequences," while other faculty

members were not similarly reprimanded.  The evidence shows that Dr. Hingorani sent an email to all COBA faculty explaining that a student had been removed from a particular course, requesting that the faculty advisor meet with Dr. Hingorani later, and stating that the student's faculty advisor would not be mentioned by name.  (Doc. 65-6 at 4.)  Dr. Hingorani's email concluded: "This is serious and will have consequences."  (*Id.*)  Dr. Osman then responded to Dr. Hingorani, copying the COBA faculty, and stated that he (Dr. Osman) was the student's faculty advisor and why he took certain actions.  It is undisputed that Dr. Osman received no discipline or loss of pay or benefits as a result of this incident.

Dr. Osman also contends that out of 22 full-time COBA faculty members, he was the only African Muslim faculty member and one of three Black Ph.D. faculty members.  Additionally, Dr. Hingorani allegedly did not recommend three Black Ph.Ds. for professional advancement: Dr. Osman, Dr. Bell-Haynes, and Dr. Gittens.

### 5.  Dr. Osman's Internal Complaints and EEOC Charges

At some unspecified time in 2020, Dr. Osman began reporting "issues" he was having with Dr. Hingorani to Dr. Thompson.  (Doc. 65-2 at 3.)  According to Dr. Osman's declaration, these issues pertained to his nonreceipt of teaching credit for his years teaching at Alcorn State.  Dr. Thompson acknowledged in his

deposition that Dr. Osman had told him he felt Dr. Hingorani was treating him differently than non-African faculty, although the timeframe of this conversation is unclear.

On or about January 28, 2021, Dr. Osman emailed Dr. Pettis complaining that Dr. Hingorani had "misled" Dr. Osman in many ways, stating he had "never encountered this type of misleading and this type Discriminating behaviour." (Doc. 65-7 at 3.)   In response, Dr. Pettis reminded Dr. Osman that official complaints must be filed in accordance with the relevant Faculty Handbook provisions. (*Id.* at 2.)

On or about February 18, 2021, Dr. Osman submitted a formal grievance to Human Resources, which he amended on March 31, 2021.   (Doc. 62-9.) Dr. Osman's grievance alleged racially discriminatory treatment by Dr. Hingorani and that Dr. Hingorani had misrepresented tenure information.  Dr. Pettis contends he was not involved in the investigation, findings, or recommendations regarding Dr. Osman's grievance.   Additionally, Dr. Pettis asserts he was not aware of Dr. Osman's grievance until after the promotion decision was made, and Dr. Osman presents no evidence to the contrary.

On or about May 7, 2021, Dr. Osman filed a Charge of Discrimination with the EEOC.   Because Dr. Osman did not yet know he had been denied the promotion, the EEOC charge does not mention the promotion denial.  Dr. Osman

asserted that Dr. Hingorani had subjected him "to unfair treatment in comparison to my similarly-situated co-workers: of 9 Associate professors and professors there is one African-American, 2 Caucasians, and the rest are Asian."  (Doc. 62-17.) Dr. Osman checked the boxes for religion and national origin but not race.  (*Id.*) On May 11, 2021, the EEOC issued a right-to-sue notice.  (Doc. 52-2.)

Dr. Pettis contends he was not involved in the investigation or response to Dr. Osman's EEOC charge.  Dr. Pettis further asserts that he did not know about Dr. Osman's EEOC charge until after the promotion decision had been made, and Dr. Osman presents no evidence to the contrary.

On July 1, 2021, Dr. Osman emailed Dr. Pettis to file a grievance regarding the promotion denial, among other things.  In the email, Dr. Osman referenced the fact that he had previously filed an EEOC charge regarding discrimination by Dr. Hingorani.  On July 9, 2021, Dr. Pettis responded that an initial grievance is not filed with the provost and further advised Dr. Osman to consult the relevant Faculty Handbook provisions regarding filing grievances.  Dr. Pettis further stated that ASU's practice is "to not engage in discussions regarding matters that are the subject of pending or threatened legal action" and that "[a] number of [Dr. Osman's] concerns could be associated with such legal action."  (Doc. 65-16 at 3.)  Around this time Dr. Osman also contacted Dr. Hingorani to discuss the

20

promotion denial, but Dr. Hingorani declined to speak with Dr. Osman because he had chosen "the legal route."  (Doc. 65-2 at 5.)

On July 10, 2021, Dr. Osman submitted a formal grievance to Human Resources regarding his promotion denial.  Among other things, Dr. Osman asserted that the promotion review process occurred after he complained about Dr. Hingorani.  (Doc. 62-13 at 4–5.)  The grievance was first reviewed by Dr. Thompson.  In accordance with the Faculty Handbook, Dr. Osman appealed the grievance to Dr. Hingorani, and then to Dr. Pettis.  (*Id.* at 1.)  Dr. Osman could have further appealed the grievance to the Faculty Grievance Committee and then to the president (Doc. 62-4 at 63–64), but he did not.

Dr. Osman filed a second EEOC charge on or about November 9, 2021.  In the second charge, Dr. Osman asserted that after submitting his first charge, he learned he had been denied the Associate Professor promotion.  He further asserted that ASU had retaliated against him and "continue[d] to retaliate against [him] for filing complaints of discrimination."  (Doc. 62-20.)  He checked the box for retaliation only.  (*Id.*)  The EEOC issued a right-to-sue notice on or about April 19, 2022.  (Doc. 62-22.)

**C.  Dr. Osman's Federal Lawsuit**

In Counts One through Three, Dr. Osman claims that ASU discriminated against him based on his religion, national origin, and race (including ancestry),

respectively, all in violation of Title VII.  In Count Four, Dr. Osman claims that Dr. Hingorani discriminated against him based on his race in violation of § 1981. In Counts Five through Seven, Dr. Osman claims that ASU retaliated against him for complaining about religious discrimination, race discrimination, and national origin discrimination, respectively, all in violation of Title VII.  In Count Eight, Dr. Osman claims that Dr. Hingorani retaliated against him in violation of § 1981 for complaining about race discrimination.  Finally, in Count Nine, Dr. Osman claims that Dr. Hingorani violated his equal protection rights under the Fourteenth Amendment to the United States Constitution.[7]

## V.  DISCUSSION

"[Dr. Osman's] disparate treatment claims, brought under Title VII, § 1981, and § 1983, all require proof of discriminatory intent."  *See Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767 (11th Cir. 2005) (per curiam); *see also Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022) (explaining that "[t]he elements of a claim of race discrimination under 42 U.S.C. § 1981 are also the same as a Title VII disparate treatment claim in the employment context" (citation omitted)); *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 919 (11th Cir. 2018) (explaining that claims of discrimination and retaliation are examined "under the same legal framework regardless of whether the plaintiff invokes [§ 1981] or [Title VII]").

---

[7] The equal protection and § 1981 claims are brought under § 1983.

Where, as here, the plaintiff attempts to prove discriminatory intent by circumstantial rather than direct evidence, their claims generally are subject to the familiar *McDonnell Douglas* burden-shifting framework.  *See Vessels*, 408 F.3d at 767; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

But the *McDonnell Douglas* framework is not "the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp*., 644 F.3d 1321, 1328 (11th Cir. 2011).  "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'"  *Id.* (footnote omitted) (citation omitted).  A plaintiff may establish a "convincing mosaic" with "evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (citations omitted) ("*Lewis II*"); *see also Jenkins*, 26 F.4th at 1251 (analyzing a § 1981 race discrimination claim under the convincing mosaic framework).

### A. Discrimination

Construing his briefing liberally, Dr. Osman argues that he was discriminated against based on his religion, national origin, and race (including ancestry) when ASU failed to promote him to an Associate Professor position in 2021; when Dr. Hingorani failed to congratulate or acknowledge Dr. Osman's accomplishments to the rest of the COBA; when Dr. Hingorani failed to select Dr. Osman to serve on certain committees; when Dr. Hingorani publicly reprimanded Dr. Osman regarding Dr. Osman's conduct as a faculty advisor; and when Dr. Osman was accused of plagiarism during the promotion review process. Dr. Osman does not argue that he can survive summary judgment under the traditional *McDonnell Douglas* burden-shifting framework. Instead, he argues only that he can demonstrate a convincing mosaic of circumstantial evidence of discrimination.

The Court's discussion of Dr. Osman's discrimination claims will proceed in three parts. First, the Court will consider ASU's argument that Dr. Osman failed to exhaust his administrative remedies regarding some of his Title VII claims. Second, the Court will address which of ASU's actions constitutes an adverse

employment action.   Finally, the Court will address whether Dr. Osman has demonstrated a convincing mosaic sufficient to avoid summary judgment.[8]

### 1.  Exhaustion of Administrative Remedies

ASU argues it is entitled to summary judgment because Dr. Osman failed to exhaust his administrative remedies with respect to his Title VII race discrimination claim and his failure to promote claim.   ASU contends that Dr. Osman's first EEOC charge did not mention the promotion denial and that the charge alleged discrimination based on religion and national origin only.   ASU further contends that Dr. Osman's second EEOC charge was not timely filed, and even if it were, it does not allege discrimination—only retaliation.

Before pursuing a Title VII action in federal court, an employee must first file a charge of discrimination with the EEOC "within 180 days 'after the alleged unlawful employment practice occurred.'"   *See Ledbetter v. Goodyear Tire & Rubber Co.*, 421 F.3d 1169, 1178 (11th Cir. 2005) (citation omitted).   However,

---

[8] Dr. Osman contends, in conclusory fashion, that ASU failed to move for summary judgment on the merits of his Title VII race discrimination claim.   (Doc. 66 at 51.)   ASU insists that it did, asserting that it "fashioned its argument based upon the claim actually made by Osman in his Second Amended Complaint."   (Doc. 68 at 9.)   ASU notes that Dr. Osman did not claim to be of any particular race in his Second Amended Complaint and that his race discrimination count (Count Three) speaks to race in terms of his African ancestry.   (*See generally* Doc. 52; *id.* at 12–13.)   And as Dr. Osman points out, at least one court has observed that Title VII claims "based on race and national origin 'may substantially overlap or even be indistinguishable depending on the specific facts of a case.'"   *Vill. of Freeport v. Barrella*, 814 F.3d 594, 606 (2d Cir. 2016) (citation omitted).

The Court in no way suggests that race is always synonymous with ancestry, national origin, or both.   In this case, however, the Court agrees with ASU that it did move for summary judgment on the merits of Dr. Osman's race discrimination claim given the way he pled the claim.

"[u]nlike a plaintiff proceeding under Title VII, a plaintiff alleging employment discrimination in violation of §§ 1981 and 1983 need not exhaust administrative remedies before suing in federal court." *Sherrod v. Bd. of St. Lucie Cnty.*, 635 F. App'x 667, 671 (11th Cir. 2015) (per curiam). Thus, even if the Court concluded that some of Dr. Osman's Title VII claims were not administratively exhausted, such conclusion would have no impact on his § 1981 or equal protection claims. *See Mathis v. Leggett & Platt*, 263 F. App'x 9, 12 (11th Cir. 2008) (per curiam) (explaining that the plaintiff's § 1981 race discrimination claim survived "despite [the plaintiff's] untimely Title VII race discrimination charge because § 1981 actions are not subject to the administrative exhaustion requirement").

In response, Dr. Osman argues that ASU waived its administrative exhaustion argument because ASU failed to raise it in a motion to dismiss the Second Amended Complaint. Dr. Osman additionally argues that he did adequately exhaust his administrative remedies because (1) the first EEOC charge encompasses allegations of race discrimination, (2) he was not required to file a second EEOC charge regarding the promotion denial, and alternatively (3) the second EEOC charge was timely filed and encompassed allegations of race discrimination notwithstanding his failure to check the box for race.

The Court rejects Dr. Osman's contention that ASU waived its administrative exhaustion argument. In its Answer to the Second Amended

Complaint, ASU pled failure to exhaust as an affirmative defense.  (*See* Doc. 54 at 11–12.)  Rule 8 of the Federal Rules of Civil Procedure requires a party to affirmatively state any affirmative defense "[i]n responding to a pleading," which ASU did in its Answer.  Dr. Osman cites nothing in the Federal Rules of Civil Procedure or binding authority that requires a defendant who asserts an affirmative defense in their answer to also file a motion to dismiss based on that same affirmative defense in order to preserve the defense.  Thus, the Court finds Dr. Osman's argument unavailing.

Turning to the merits of whether Dr. Osman administratively exhausted his failure to promote claim, the Court finds it to be a close call involving several legal inquiries, including the scope of two EEOC charges and whether one charge was timely or even required.  Moreover, Dr. Osman brings race discrimination claims, including the failure to promote claim, under Title VII as well as §§ 1981 and 1983, and these claims are analyzed under the same framework.  Thus, even if this Court concluded Dr. Osman failed to exhaust his administrative remedies regarding some of his Title VII claims, the Court would still have to analyze Dr. Osman's §§ 1981 and 1983 claims.  For these reasons, and because the Court concludes Dr. Osman's Title VII claims fail on the merits, the Court will assume without deciding that Dr. Osman exhausted his administrative remedies regarding his Title VII race discrimination and failure to promote claims.

## 2. Adverse Employment Action

While it is undisputed that ASU's failure to promote Dr. Osman is an adverse employment action, ASU argues that the remaining incidents of allegedly disparate treatment are not.[9]  To prove an adverse employment action for purposes of his discrimination claims, Dr. Osman must show "a *serious and material* change in the terms, conditions, or privileges of employment."  *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001), *overruled in part on other grounds by Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53 (2006).  The employer's action must satisfy a "threshold level of substantiality" and must impact the plaintiff's employment "in a real and demonstrable way."  *Id.*  "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances."  *Id.*

Dr. Osman produces insufficient evidence that any of the non-promotion incidents about which he complains constitutes an actionable adverse employment action.  Dr. Osman argues that Dr. Hingorani's failure to appoint him to committees interfered with his ability to professionally advance in academia, and that accusations of plagiarism "are serious and have potentially career ending

---

[9] Although Dr. Osman attempts to survive summary judgment under the convincing mosaic framework, he still must show that he suffered an adverse employment action because an adverse employment action is an element of the Title VII claim itself, not just an element of the *McDonnell Douglas prima facie* case.  *See Holland v. Gee*, 677 F.3d 1047, 1056 (11th Cir. 2012).  Dr. Osman does not argue otherwise.

effects." (Doc. 66 at 63.) These vague assertions, which are not supported by evidence, are insufficient to show that Dr. Osman's employment was impacted "in a real and demonstrable way" when he was not assigned to his committees of choice or was accused of self-plagiarism—conduct which Dr. Osman does not deny committing—during the promotion review process under the circumstances presented here. *See Davis*, 245 F.3d at 1239. Dr. Osman's subjective views are not controlling. *See id.*

Similarly, the Court agrees with ASU that Dr. Osman has not shown he suffered any tangible harm by not being recognized or congratulated by Dr. Hingorani. Finally, Dr. Hingorani's allegedly public reprimand of Dr. Osman regarding Dr. Osman's advisement conduct does not rise to the level of an adverse action because it did not result in discipline, a loss of pay or benefits, or any other tangible consequence. *See id.* at 1240 (holding that a negative job performance memo in an employee's file was not an adverse employment action because the memo did not result in any "tangible consequence . . . in the form of loss of pay or benefits or further discipline"). Based on the evidence presented, none of the non-promotion conduct about which Dr. Osman complains caused a serious and material change in the terms, conditions, or privileges of employment, and thus they are not adverse employment actions for purposes of his discrimination claims. *See id.* at 1239.

### 3.  Convincing Mosaic

Having determined that ASU's failure to promote Dr. Osman is the only actionable adverse employment action for purposes of his discrimination claims, the Court now turns to the convincing mosaic analysis.  Dr. Osman argues he can demonstrate a convincing mosaic based on Dr. Hingorani's alleged statements and conduct, ASU's allegedly better treatment of similarly situated employees, and the purportedly pretextual nature of ASU's justification for not promoting him. "Unfortunately for [Dr. Osman]," however, the record in this case "is more than a few tiles short of a mosaic, let alone a convincing one." *See Hossain v. Steadman*, 855 F. Supp. 2d 1307, 1317 (S.D. Ala. 2012) (citation omitted).

As a threshold matter, the Court finds that Dr. Pettis was the final decisionmaker regarding Dr. Osman's promotion.  This fact is critical because the convincing mosaic analysis asks whether the record "presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Smith*, 644 F.3d at 1328 (citation omitted). Although Dr. Hingorani and the promotion review committee members made recommendations regarding Dr. Osman's promotion, the record contains no evidence that any of them had the authority to overrule Dr. Pettis. *See Clover v. Total Sys. Servs.*, 176 F.3d 1346, 1356 (11th Cir. 1999) (rejecting the plaintiff's argument that a management-level employee was a decisionmaker because there

was no evidence that the employee actually had the authority to overrule a senior vice president's termination decision).  Moreover, there is no evidence that ASU's President or the Board took any action regarding Dr. Osman's promotion. Consequently, Dr. Pettis is the relevant decisionmaker regarding Dr. Osman's promotion.

To recap, Dr. Pettis recommended Dr. Osman not be promoted to Associate Professor because Dr. Osman lacked the requisite teaching experience.  The Faculty Handbook requires Associate Professors, whether appointed or promoted, to have five years of successful teaching experience at an accredited college or university, with three years at the assistant professor rank.  Because Dr. Osman was hired at zero years, ASU considered him to have two years of teaching experience at the assistant professor rank when he applied for the Associate Professor promotion.  Critically, Dr. Osman presents no evidence that any COBA faculty member was *ever* appointed or promoted to Associate Professor under the applicable Faculty Handbook without five years of teaching experience and three years at the assistant professor rank.

Dr. Osman argues he can demonstrate a convincing mosaic based on Dr. Hingorani's statements and conduct, including Dr. Hingorani's alleged derogatory comments about Black and African-American ASU students, Dr. Hingorani's "involve[ment] in the decisions of non-advancement for three Black

COBA PhDs," (Doc. 66 at 55), and Dr. Hingorani's alleged deviations from the Faculty Handbook during Dr. Osman's promotion review. Dr. Osman also produced evidence that Dr. Hingorani said he did not like Dr. Osman because he (Dr. Osman) is Black and would find any reason to deny Dr. Osman's promotion.[10] Additionally, it is undisputed that Dr. Hingorani told Dr. Osman in an email that the Faculty Handbook was "the Bible," which Dr. Osman found offensive because he is Muslim.

While these statements and actions, if true, may demonstrate discriminatory bias on Dr. Hingorani's part, they do not justify holding ASU liable for intentional discrimination under the circumstances presented here because Dr. Hingorani's alleged conduct fails to demonstrate that *Dr. Pettis*'s promotion decision was based on any of Dr. Osman's protected characteristics. *See Bell-Haynes v. Ala. State Univ.*, No. 2:21-cv-18-ECM, 2023 WL 2534738, at *11 (M.D. Ala. Mar. 15, 2023) (concluding that a former professor failed to establish a convincing mosaic of sex discrimination in a lawsuit against ASU because any improprieties in the actions taken by Dr. Hingorani and other male members of COBA "had insufficient causal impact because [Dr.] Pettis was the final decisionmaker in denying [the plaintiff]

---

[10] Surprisingly, Dr. Osman does not mention these alleged comments by Dr. Hingorani in his legal analysis but instead mentions them only in his statement of facts. (*See generally* Doc. 66.)

tenure").[11]   Indeed, Dr. Osman does not even argue that Dr. Hingorani's alleged bias may be imputed to Dr. Pettis under a "cat's paw" theory such that ASU may be held liable.  *See Crawford v. Carroll*, 529 F.3d 961, 979 n.21 (11th Cir. 2008) ("Under a 'cat's paw' theory, a non-decisionmaking employee's discriminatory animus may be imputed to a neutral decisionmaker when the decisionmaker has not independently investigated [the plaintiff's situation].").

Here, the record reflects that Dr. Pettis independently investigated Dr. Osman's dossier and Notice of Employment and determined Dr. Osman was not eligible for promotion for reasons different from those of Dr. Hingorani.  And it is undisputed that Dr. Hingorani did not speak about his recommendation with Dr. Pettis.  Dr. Pettis also testified he would have not recommended Dr. Osman to be promoted even if the committee or Dr. Hingorani had recommended the promotion.  Finally, Dr. Osman does not explain how Dr. Hingorani's alleged deviations from the Faculty Handbook or his criticism of Dr. Osman's résumé impacted Dr. Pettis's recommendation that Dr. Osman not be promoted due to his lack of teaching experience.  Thus, the Court agrees with ASU that the undisputed facts preclude a finding that Dr. Hingorani's alleged bias may be imputed to Dr. Pettis.  *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1270 (11th Cir. 2001) ("Where a decisionmaker conducts his own evaluation and makes an

---

[11] While the Court recognizes that *Bell-Haynes* is nonbinding, the Court finds its analysis persuasive.

independent decision, his decision is free of the taint of a biased subordinate employee."). Accordingly, Dr. Hingorani's alleged conduct does not help Dr. Osman establish a convincing mosaic. *See Bell-Haynes*, 2023 WL 2534738, at *11 (M.D. Ala. Mar. 15, 2023); *cf. Jenkins*, 26 F.4th at 1251 (concluding that a white plaintiff established a convincing mosaic of intentional discrimination where, among other things, the *decisionmaker* made racially biased comments about other white employees).

In further support of his convincing mosaic argument, Dr. Osman contends that ASU treated three faculty members more favorably regarding teaching credits, promotion/tenure, or both: Dr. Ngo-Ye, Dr. Kim, and Dr. Zaino. Upon examination, however, ASU's treatment of Dr. Osman's proffered comparators does not permit an inference of intentional discrimination.

According to Dr. Osman, Dr. Ngo-Ye was treated more favorably because he was hired with credit for two years' teaching experience and eligibility for tenure after two years at ASU. But it is undisputed Dr. Ngo-Ye was hired into a different department under different rules about teaching credits. Additionally, Dr. Ngo-Ye's race, religion, and national origin are unknown, creating an additional obstacle to Dr. Osman's ability to demonstrate that any alleged disparate treatment was based on race, religion, or national origin. Thus, Dr. Ngo-Ye's

hiring is not probative of whether ASU discriminated against Dr. Osman based on race, religion, or national origin when it failed to promote him.

As for Dr. Kim, he was allegedly treated more favorably because Dr. Hingorani "took great strides to fight for tenure for Dr. Kim, . . . even going so far as to recommend him over the committee's objection." (Doc. 66 at 37.)  But Dr. Pettis disagreed and did not recommend Dr. Kim, and so Dr. Kim was not granted tenure.  Thus, as it concerns ASU's Title VII liability for intentional discrimination for denying Dr. Osman a promotion, Dr. Hingorani's alleged preferential treatment of Dr. Kim is not probative.  Additionally, Dr. Kim, like Dr. Osman, was hired at ASU with zero years of creditable teaching experience despite having prior teaching experience at other institutions.  Thus, to the extent Dr. Osman argues that his nonreceipt of teaching credit supports an inference of discrimination, ASU's similar treatment of a faculty member who lacks Dr. Osman's protected characteristics undermines his argument.

Dr. Osman asserts that Dr. Zaino was treated more favorably because he was hired at the Associate Professor rank without any years at ASU.  But Dr. Osman was denied the Associate Professor promotion because he lacked the requisite years of teaching experience, *not* because he lacked years *at ASU*.  And Dr. Osman identifies no evidence of whether Dr. Zaino had five years of teaching experience at an accredited college or university, with three years at the assistant professor

rank. The record also does not reveal Dr. Zaino's race, religion, or national origin. Thus, on this record, Dr. Zaino's hiring is not probative of whether ASU discriminated against Dr. Osman based on race, religion, or national origin when it declined to promote him.

The Court acknowledges that Dr. Osman need not identify strict comparators who were treated more favorably to survive summary judgment. However, considered separately or together, the evidence of ASU's treatment of (1) Dr. Ngo-Ye, who was hired into a different department under different rules about teaching credits and whose race, religion, and national origin are unknown; (2) Dr. Kim, who was denied tenure during Dr. Osman's application cycle and who, like Dr. Osman, was hired at ASU at zero years despite having prior teaching experience; and (3) Dr. Zaino, who was hired directly as an Associate Professor and whose race, religion, and national origin are unknown, does not constitute "systematically better treatment of similarly situated employees." *See Lewis II*, 934 F.3d at 1185; *cf. Jenkins*, 26 F.4th at 1250–51 (concluding that, in case where the white plaintiff was punished by his black supervisor for a particular rule violation, evidence that a black employee, who was not a strict comparator, had committed the same rule violation but was not punished by the supervisor helped the plaintiff establish a convincing mosaic). Again, Dr. Osman presents no evidence that any COBA faculty member was *ever* appointed or promoted to

Associate Professor under the applicable Faculty Handbook without five years of teaching experience and three years at the assistant professor rank.  Thus, this evidence would not permit a reasonable jury to conclude that ASU discriminated against Dr. Osman based on his race, religion, or national origin when it failed to promote him to Associate Professor.

Dr. Osman also argues ASU's justification for not promoting him was pretextual.  He can show pretext by showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action."  *Munoz v. Selig Enters.*, 981 F.3d 1265, 1277 (11th Cir. 2020) (citation omitted).

Dr. Osman asserts ASU's explanation that he lacked the requisite teaching experience was pretextual because, according to him, "[t]he Faculty Handbook does not specify anything about teaching credits outside of the section devoted to tenure," (Doc. 66 at 66), although he fails to cite the tenure provision he references.  Dr. Osman further argues ASU's contention that he was required to have "credit" for a number of years to be eligible for a promotion is "unreasonable under the circumstances."  (*Id.* at 67.)  He asserts that if such experience were required, Dr. Hingorani and Dr. Thompson would have known about it, and his application would have been screened out earlier in the process "before the time and resources are wasted on an ineligible candidate." (*Id.*)  He also contends that if

the reason for his promotion denial was as simple as a lack of teaching experience, Dr. Pettis would have said so when Dr. Osman asked him in July 2021.

The Court construes part of Dr. Osman's argument as follows: under the Faculty Handbook, the concept of probationary credit for prior teaching experience applies only to tenure, and although a faculty member may not have been awarded such credit for *tenure* purposes, the faculty member's prior teaching experience still counts for promotion purposes. And Dr. Osman has produced some evidence to support this interpretation of the Faculty Handbook. For example, Dr. Hingorani, who allegedly said he would do whatever he could to prevent Dr. Osman from being promoted, testified that Dr. Osman was ready for the Associate Professor promotion as it concerns teaching experience. Additionally, the Faculty Handbook's references to probationary service and probationary credit are tied to tenure. By contrast, the provisions regarding promotions and special criteria by rank do not mention probationary service or probationary credit.

The Court will assume without deciding that Dr. Osman's interpretation is correct or at least reasonable, meaning probationary/teaching credit matters only for tenure and not promotion. Even so, Dr. Osman has at best shown that Dr. Pettis misinterpreted or misapplied the Faculty Handbook when he considered Dr. Osman's promotion application. But "[a] plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact

motivated by race [or other protected characteristic]." *Alexander v. Fulton Cnty.*, 207 F.3d 1303, 1339 (11th Cir. 2000), *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003); *see also Jefferson*, 891 F.3d at 924 (explaining that an employer may act for "a good reason, a bad reason, *a reason based on erroneous facts*, or for no reason at all, as long as its action is not for [an unlawful] reason" (emphasis added) (alteration in original) (citation omitted)). Thus, Dr. Pettis's alleged misinterpretation or misapplication of the Faculty Handbook, without more, would not allow a reasonable jury to conclude that his promotion decision was based on Dr. Osman's race, religion, or national origin, or any combination thereof. *Cf. Bell-Haynes*, 2023 WL 2534738, at *15 (concluding that a former professor's retaliation claim failed where the evidence showed that Dr. Pettis's "calculation of the years left on [the professor's] probationary contract was a clerical or interpretive mistake, not retaliation"). Moreover, while it may be more efficient to screen out ineligible candidates earlier in the promotion review process, ASU's failure to do so, without more, does not permit an inference of intentional discrimination. *See Jefferson*, 891 F.3d at 924.

Finally, regarding ASU's failure to tell Dr. Osman why he was denied the promotion when he asked in July 2021, the Faculty Handbook does not require ASU to tell unsuccessful candidates why their promotion was denied. Moreover, Dr. Pettis explained that ASU does not discuss matters that are the subject of

pending or threatened litigation, and Dr. Osman has not produced evidence to the contrary.[12]   Dr. Osman has thus failed to show that ASU's actions permit an inference of intentional discrimination.

In sum, Dr. Osman has failed to produce sufficient evidence from which a reasonable jury could conclude that ASU's decision not to promote him was based on his race, national origin, or religion, or any combination thereof.  Consequently, the Defendants' motion for summary judgment is due to be granted on Dr. Osman's Title VII discrimination claims against ASU.  Additionally, because Dr. Osman's discrimination claims are all analyzed under the same framework, and because he offers no separate argument as to why Dr. Hingorani may be held liable under §§ 1981 and 1983 notwithstanding ASU's lack of liability under Title VII, the Defendants' motion for summary judgment is also due to be granted on Dr. Osman's § 1981 and equal protection claims against Dr. Hingorani.

## B. Retaliation

Dr. Osman also claims that the Defendants unlawfully retaliated against him based on various conduct by Dr. Hingorani and Dr. Pettis.   In addition to prohibiting discrimination, Title VII prohibits employer from retaliating against

---

[12] Dr. Osman contends that Dr. Thompson "evaded all questions during his deposition about whether ASU generally  made it difficult to communicate once a faculty member initiated legal action."  (Doc. 66 at 31 (citing Doc. 65-1 at 18).)  The Court disagrees with Dr. Osman's characterization of Dr. Thompson's testimony, (*see* Doc. 65-1 at 18), but in any event, the cited testimony is insufficient to create a genuine dispute of material fact about whether ASU declines to discuss matters that are the subject of pending or threatened litigation.

employees who oppose unlawful employment practices, *see* 42 U.S.C. § 2000e-3(a), sometimes referred to as "engag[ing] in a statutorily protected activity," *see, e.g.*, *Bryant v. Jones*, 575 F.3d 1281, 1307–08 (11th Cir. 2009).  Moreover, § 1981 encompasses retaliation claims premised upon an employee's complaints about race discrimination.  *See CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 445 (2008); *Bryant*, 575 F.3d at 1301.

A Title VII retaliation claim based on circumstantial evidence is ordinarily analyzed under the *McDonnell Douglas* framework.  *Tolar v. Bradley Arant Boult Commings, LLP*, 997 F.3d 1280, 1289 (11th Cir. 2021).  But Dr. Osman attempts to avoid summary judgment on his Title VII retaliation claims by demonstrating a convincing mosaic of circumstantial evidence of retaliation.[13]

The Eleventh Circuit does not appear to have considered in a published decision whether a plaintiff may rely on the convincing mosaic framework to establish circumstantial evidence of retaliation, although in unpublished opinions the court has assumed that he may.  *See Bailey v. Metro Ambulance Servs.*, 992 F.3d 1265, 1273 n.1 (11th Cir. 2021) (per curiam) (making this observation and declining to consider the issue because on appeal the plaintiff abandoned the

---

[13] Dr. Osman pleaded three separate retaliation claims.  As the Defendants correctly point out, unlawful retaliation is not based on an employee's protected characteristic, such as race, but rather is based on an employee's engaging in protected activity, which can include complaining about racially discriminatory treatment, *see Martin v. Financial Asset Mgmt. Sys.*, 959 F.3d 1048, 1053 (11th Cir. 2020).  As such, the Defendants addressed Dr. Osman's three retaliation claims together.  Similarly, Dr. Osman addressed his three retaliation claims together in his response.  Consequently, the Court will do the same.

convincing mosaic theory in support of his retaliation claim); *see also Calvert v. Doe*, 648 F. App'x 925, 929 (11th Cir. 2016) (per curiam) (concluding that the plaintiff presented "'a convincing mosaic of circumstantial evidence' that would permit a jury to infer that the [employer] retaliated against him because of his previous lawsuit"); *Fonte v. Lee Mem'l Health Sys.*, No. 20-13240, 2021 WL 5368096, at *7 n.5 (11th Cir. Nov. 18, 2021) (per curiam) (assuming without deciding that retaliation claims may be evaluated under the convincing mosaic framework); *James v. City of Montgomery*, 823 F. App'x 728, 735 (11th Cir. 2020) (per curiam) (assuming without deciding that retaliation claims can survive summary judgment under a convincing mosaic theory but concluding the plaintiff did not present a convincing mosaic).

This Court will assume without deciding that a Title VII retaliation claim can survive summary judgment under the convincing mosaic framework. Whatever the framework, to survive a summary judgment motion on a retaliation claim, the plaintiff must produce evidence sufficient to permit an inference that, but for his protected activity, the employer would not have taken the alleged adverse action. *See Tolar*, 997 F.3d at 1289.

### 1.  Adverse Employment Actions

For his retaliation claims, Dr. Osman relies on the same adverse actions as he does for his discrimination claims.  He also claims ASU's refusal to discuss the

promotion denial with him constitutes an adverse employment action. An adverse employment action for purposes of a Title VII retaliation claim is an action that "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington Northern*, 548 U.S. at 68 (citation omitted). This standard protects an employee from "a wider range of retaliatory conduct than would be available under the standard applied" in Title VII discrimination cases. *See Crawford*, 529 F.3d at 974. Nonetheless, an employee's decision to engage in protected activity "cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington Northern*, 548 U.S. at 68.

Except for the promotion denial and ASU's subsequent refusal to discuss the reasons with him,[14] Dr. Osman produces insufficient evidence that any of the conduct about which he complains constitutes an actionable adverse employment action. The accusations of self-plagiarism—conduct which Dr. Osman does not deny committing—would not dissuade a reasonable employee from engaging in protected conduct under the circumstances presented here. Similarly, Dr. Hingorani's failures to (1) appoint Dr. Osman to his committee of choice and (2) acknowledge and congratulate Dr. Osman on his accomplishments, would not

---

[14] Dr. Osman testified that ASU's refusal to tell him why he was not promoted or what improvements he should make to his dossier hindered his professional advancement by preventing him from preparing to reapply for the promotion the following year. (*See* Doc. 65-2 at 5.) The Court will assume without deciding that ASU's refusals were adverse actions.

dissuade a reasonable employee from engaging in protected conduct. *See Burlington Northern*, 548 U.S. at 68; *Crawford*, 529 F.3d at 973–74; *cf. Seals v. Leath*, No. 3:19-CV-468-RAH, 2022 WL 16701109, at *11 (M.D. Ala. Nov. 3, 2022) (rejecting a university professor's First Amendment retaliation claim premised upon non-appointment to his committee of choice because such non-appointment would not have dissuaded a reasonable person from engaging in protected speech). Instead, Dr. Hingorani's alleged actions are more akin to "petty slights or minor annoyances" that fail to support an actionable retaliation claim. *See Burlington Northern*, 548 U.S. at 68.

Finally, Dr. Hingorani's alleged public reprimand of Dr. Osman regarding his advisement conduct does not rise to the level of an adverse action under the circumstances presented here. In a faculty-wide email, Dr. Hingorani scolded an unnamed faculty advisor—whom Dr. Osman subsequently identified as himself—and stated that there would be "consequences" for the advisor's conduct, but there is no evidence that any consequences materialized. Viewing the evidence in the light most favorable to Dr. Osman, the alleged public reprimand would not have dissuaded a reasonable employee from engaging in protected activity.

## 2.  Protected Activity

The Court now turns to Dr. Osman's alleged protected activity, which, like an adverse action, is an element of the Title VII claim itself. The Court discerns

six potential instances where Dr. Osman engaged in protected activity: (1) the 2020 complaint to Dr. Thompson; (2) the January 28, 2021 email to Dr. Pettis; (3) the February 2021 formal grievance; (4) the May 2021 EEOC charge; (5) the July 2021 email to Dr. Pettis; and (6) the July 2021 formal grievance regarding the promotion denial.

The Court finds that Dr. Osman's February 2021 formal grievance and May 2021 EEOC charge constitute protected activity, and the Defendants do not argue otherwise. The Court will assume without deciding that Dr. Osman's 2020 complaint to Dr. Thompson, his January and July emails to Dr. Pettis, and his July 2021 formal grievance constitute protected activity also.

### 3. Convincing Mosaic

The Court now turns to the question of whether Dr. Osman has produced a convincing mosaic of circumstantial evidence of retaliation—i.e., that but for his engaging in protected activity, he would not have been denied the promotion to Associate Professor. Dr. Osman fails to do so because he cannot show that the relevant decisionmaker—Dr. Pettis—knew about the majority of his protected activity before making the promotion decision, and because the evidence does not otherwise support a reasonable inference that his protected conduct was the but-for cause of his promotion denial.

To establish the requisite causal connection between a plaintiff's protected activity and the employer's adverse action, a plaintiff must, at a minimum, "generally establish that the employer was actually aware of the protected expression at the time it took [the] adverse employment action." *Clover*, 176 F.3d at 1354 (citation omitted). That knowledge "can be established through circumstantial evidence—but not by unsupported inference." *Martin*, 959 F.3d at 1053. Thus, "if [Dr. Pettis] did not know about [Dr. Osman's] discrimination complaints," Dr. Pettis could not have denied Dr. Osman's promotion because of those complaints. *See id.*

Except for the January 2021 email, Dr. Osman cannot show that Dr. Pettis knew about Dr. Osman's protected activity when he decided to deny Dr. Osman's promotion, which is fatal to his causation showing. Dr. Osman presents no evidence that Dr. Pettis knew about the complaints to Dr. Thompson in 2020. Regarding the February 2021 grievance, Dr. Pettis asserts he had no knowledge of the grievance until after the promotion decision had been made, (Doc. 62-23 at 2), and Dr. Osman presents no evidence to the contrary. And although Dr. Pettis's letter regarding the promotion denial is dated the same day as Dr. Osman's first EEOC charge (May 7, 2021), Dr. Pettis claims he did not know about the EEOC charge until after the promotion decision had been made, (*id.*), which occurred no later than April 15, 2021, and Dr. Osman presents no evidence to the contrary.

"[W]hen an employer contemplates an adverse action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006). Additionally, Dr. Osman's July 2021 email to Dr. Pettis and the July 2021 grievance both post-date the promotion denial. Absent evidence of Dr. Pettis's prior knowledge of Dr. Osman's protected activity, Dr. Osman cannot raise an inference of causation—that is, but for his protected activity, he would not have been denied the promotion. *See Martin*, 959 F.3d at 1053; *Drago*, 453 F.3d at 1308. Without an inference of causation, a reasonable jury is precluded from concluding that ASU's decision not to promote Dr. Osman was based on unlawful retaliatory animus. *See Fonte*, 2021 WL 5368096, at *7 n.5 (concluding that the plaintiff failed to present a convincing mosaic of retaliation because she failed to raise an inference of causation).

The January 2021 complaint to Dr. Pettis also does not help Dr. Osman demonstrate causation because he cannot show that ASU's justification for the promotion denial is pretextual. *See Lewis II*, 934 F.3d at 1185 (explaining that a plaintiff can establish a convincing mosaic by showing that the employer's justification is pretextual). As with the discrimination claims, ASU asserts that it denied Dr. Osman the Associate Professor promotion because he lacked the

requisite teaching experience.  For the reasons discussed above in Part V.A.3, Dr. Osman fails to demonstrate that ASU's justification is pretextual.

Dr. Osman has otherwise failed to present a convincing mosaic of circumstantial evidence of retaliation.  Dr. Osman contends that "the timing of [Dr.] Hingorani's mission to discredit [Dr. Osman] and ASU's failure to promote him, and the responses from both ASU and [Dr.] Hingorani when [Dr.] Osman tried to discuss the promotion denial with them" are "most supportive" of Dr. Osman's retaliation claims.  (Doc. 66 at 58.)  The Court will address each argument in turn.

First—the timing of Dr. Hingorani's alleged mission to discredit Dr. Osman. The problem with Dr. Osman's argument is that Dr. Pettis—not Dr. Hingorani— made the final decision not to promote Dr. Osman.  As explained above, Dr. Pettis independently reviewed Dr. Osman's dossier and Notice of Employment and concluded Dr. Osman was not eligible for promotion due to his lack of teaching experience.  Moreover, Dr. Osman identifies no record evidence establishing that Dr. Pettis relied on or considered the majority of the deficiencies identified by Dr. Hingorani, such as the typographical errors and other issues with Dr. Osman's resume.  Consequently, the timing of Dr. Hingorani's alleged conduct would not permit a reasonable jury to conclude that ASU's decision not to promote Dr. Osman was based on unlawful retaliatory animus.

The Court now turns to Dr. Pettis's and Dr. Hingorani's refusals to discuss with Dr. Osman the reasons for the promotion denial, which Dr. Osman asserts is the "[m]ost telling" of retaliation.  (Doc. 66 at 60.)   After Dr. Osman emailed Dr. Pettis about a formal grievance regarding the promotion denial, Dr. Pettis referred him to the relevant Faculty Handbook provisions and stated it was ASU's practice "to not engage in discussions regarding matters that are the subject of pending or threatened legal action" and that "[a] number of [Dr. Osman's] concerns could be associated with such legal action."   (Doc. 65-16 at 3.) Dr. Hingorani responded similarly to a similar email from Dr. Osman.  Dr. Osman has produced no evidence from which a reasonable jury could conclude that ASU's legitimate, nonretaliatory reason for its actions—that it does not discuss matters that are the subject of pending or threatened legal action—is a pretext for unlawful retaliation.   Moreover, ASU's refusal to discuss the promotion denial with Dr. Osman in light of the pending or threatened legal action does not help him establish that his protected activity was the but-for cause of the promotion denial.

In sum, Dr. Osman has failed to produce sufficient evidence from which a reasonable jury could conclude that, but for his protected activity, ASU would not have denied him the promotion and would not have refused to tell him why it denied him the promotion.   Consequently, the Defendants' summary judgment motion is due to be granted on Dr. Osman's Title VII retaliation claims against

ASU.  Additionally, because Dr. Osman's retaliation claims under Title VII and § 1981 are analyzed under the same framework, and because he offers no separate argument as to why Dr. Hingorani may be held liable under § 1981 notwithstanding ASU's lack of liability under Title VII, the Defendants' motion for summary judgment is also due to be granted on Dr. Osman's § 1981 retaliation claims against Dr. Hingorani.[15]

## VI.  CONCLUSION

For the reasons stated, it is hereby

ORDERED that the Defendants' Motion for Summary Judgment (Doc. 60) is GRANTED.

A separate Final Judgment will enter.

DONE on this the 24th day of April, 2023.

_____
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE

---

[15] Because the claims against Dr. Hingorani fail for the reasons stated, the Court pretermits discussion of whether Dr. Hingorani is entitled to sovereign or qualified immunity.